IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2021 Term

**FILED**
**October 29, 2021**
**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 20-0816

In re S.C.

Appeal from the Circuit Court of Taylor County
The Honorable Alan D. Moats, Judge
Civil Action No. 19-JA-46

REVERSED AND REMANDED
WITH DIRECTIONS

Submitted: September 15, 2021
Filed: October 29, 2021

Kristen D. Antolini, Esq.
Morgantown, West Virginia
Counsel for Petitioner

Molly A. Russell, Esq.
Legal Aid of WV, Inc.
Morgantown, West Virginia
Christina J. Rumbach, Esq.
Legal Aid of West Virginia, Inc.
Clarksburg, West Virginia
Counsel for Intervenors

Patrick Morrisey, Esq.
Attorney General
Brittany N. Ryers-Hindbaugh, Esq.
Assistant Attorney General
Brandolyn N. Felton-Ernest
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent DHHR

Rachel L. Fetty, Esq.
Morgantown, West Virginia
Guardian ad litem

JUSTICE WALKER delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syllabus Point 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

2.      ""Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syllabus Point 3, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996).

3.      "'In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided.' Syl. Pt. 1, *State*

i

*ex rel. Cash v. Lively*, 155 W. Va. 801, 187 S.E.2d 601 (1972)." Syllabus Point 4, *In re J.S.*, 233 W. Va. 394, 758 S.E.2d 747 (2014).

4. "In formulating the improvement period and family case plans, courts and social service workers should cooperate to provide a workable approach for the resolution of family problems which have prevented the child or children from receiving appropriate care from their parents." Syllabus Point 4, in part, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

5. "In making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered. The controlling standard that governs any dispositional decision remains the best interests of the child." Syllabus Point 4, *In re B.H.*, 233 W. Va. 57, 754 S.E.2d 743 (2014).

6. "'West Virginia Code, Chapter 49, Article [4], Section [601 (2015)], as amended, and the Due Process Clauses of the West Virginia and United States Constitutions prohibit a court or other arm of the State from terminating the parental rights of a natural parent having legal custody of his child, without notice and the opportunity for a meaningful hearing.' Syl. Pt. 2, *In re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973)." Syllabus Point 3, *In re T.S.*, 241 W. Va. 599, 827 S.E.2d 29 (2019).

WALKER, Justice:

Petitioner C.C. is the father of S.C., who is now eleven years old.[1] S.C. lived with her father and mother—who both abused illegal drugs—for the first four years of her life, but then Petitioner moved to Florida and her mother continued to abuse drugs. So for the past seven years, S.C. has lived her with her maternal great-grandparents, Respondents J.M and P.M. Although Petitioner had very little contact with his child for several years, no abuse and neglect petition was filed against him (or the child's mother) until after he sought custody of the child in 2019. During the proceedings against Petitioner in circuit court, it became clear that: (1) Petitioner had improved his circumstances significantly and was gradually rebuilding a relationship with his child through regular visitation, after a long period of absence from her life; and (2) the great-grandparents provide a stable, supportive, and loving home for the child. At disposition, the circuit court terminated Petitioner's parental rights under West Virginia Code § 49-4-604(c)(6) (2020) (disposition 6).

On appeal, Petitioner contends that the circuit court erred by finding that the statutory grounds for termination were met. He also raises due process and other challenges to the way the disposition hearing was conducted. The great-grandparents support the circuit court's order. And although Respondent West Virginia Department of

---

[1] As in all cases involving sensitive factors and minor children, we use initials to identify the parties. *See State v. Edward Charles L.*, 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

1

Health and Human Resources (DHHR) and the guardian ad litem did not recommend that the circuit court terminate Petitioner's parental rights below, they now advocate that we affirm its order. We agree with the circuit court that the great-grandparents should have been named as the child's custodians and it is clearly in the child's best interest that she remain in their custody. But we also agree with Petitioner that the two distinct statutory requirements of disposition 6 were not met. Based on the convergence of these findings, and the unusual circumstances presented, we reverse the order of the circuit court and remand with directions to enter disposition under West Virginia Code § 49-4-604(c)(5) (disposition 5)[2] and to appoint the great-grandparents as the child's guardians. We also direct the circuit court to set the matter for further proceedings to address continued visitation between Petitioner and the child.

## I. FACTUAL AND PROCEDURAL BACKGROUND

We begin by looking back to relevant events that happened years before the DHHR filed an abuse and neglect petition. When the child was born in 2010, her mother and Petitioner were teenagers.[3] Petitioner dropped out of school in the 11th grade and went to work to provide for the child. The couple lived together for approximately the first four

---

[2] *See* W. Va. Code § 49-4-604(c)(5), in part ("Upon a finding that the abusing parent or battered parent or parents are presently unwilling or unable to provide adequately for the child's needs, commit the child temporarily to the care, custody, and control of the department, a licensed private child welfare agency, or a suitable person who may be appointed guardian by the court[.]").

[3] The mother was fifteen and Petitioner was seventeen.

years of the child's life but never married. They received assistance from family members. During this time, Petitioner abused cocaine.

In 2014, Petitioner moved to Florida for employment and then had very little contact with his child for several years. He visited her a handful of times but neither supported the child financially and emotionally nor tended to her educational needs.[4] Petitioner did not know that the child was living with her great-grandparents, who were fulfilling those parental responsibilities because the child's mother was addicted to methamphetamine.

But while in Florida, Petitioner appears to have improved his circumstances and now wishes to have a relationship with his daughter. He is now married with a young son, R.C., and no longer uses illicit drugs. Petitioner is employed in the construction industry and his wife is a teacher.

In 2019, Petitioner filed a Petition for Support and/or Allocation of Custodial Responsibility in the Family Court of Taylor County, naming the child's mother as respondent. During a hearing on April 3, 2019, Petitioner testified that since he moved to Florida in 2014, he had seen the child three times, the last time in August 2018. Petitioner stated that he heard the child's mother was abusing methamphetamine and had been evicted

---

[4] Petitioner sent money to the mother initially, but he had not done so for several years.

from her apartment. The mother denied abusing drugs, accused Petitioner of having a history of drug use, and stated she did not want the child around Petitioner. Following the family court hearing, the mother tested positive for buprenorphine, benzodiazepines, methamphetamine, and marijuana. Petitioner also tested positive for THC, for which he had a valid prescription.[5] Based on the parties' testimony and drug test results, the family court alerted Child Protective Services (CPS) and the matter was transferred to circuit court.

Quoting the family court's findings of fact and conclusions of law, the DHHR filed a child abuse and neglect petition against Petitioner and the mother in April 2019. The DHHR alleged that the child's mother was an abusive/neglectful parent due to her ongoing drug abuse, her inability to supply the child's basic needs, and forfeiting care of the child to others.

As to Petitioner, the DHHR stated that he was interviewed about his alleged abandonment of the child. Petitioner maintained that he had contact with the child after he moved to Florida. He documented some additional visits with the child, as well as other occasions when he attempted to visit her but was unsuccessful.[6] The DHHR alleged that

---

[5] Petitioner has a prescription for THC oil, which he uses to treat anxiety.

[6] Petitioner claimed that he visited with the child in August 2018 for her birthday and bought her presents. Petitioner attempted to visit her at Thanksgiving, in November 2018.

4

Petitioner was an abusive/neglectful parent through his illegal drug history and his expenditures on drugs before meeting the basic needs of his child. It also alleged that Petitioner neglected the child emotionally by sporadic and inconsistent contact with her. And the DHHR alleged that Petitioner abandoned the child and failed to intervene to protect her when aware of the mother's drug addiction.

The circuit court held a preliminary hearing in April 2019. Petitioner waived his right to present evidence and requested supervised visits with the child, which the circuit court granted. It also ordered the DHHR to begin the Interstate Compact on the Placement of Children (ICPC) process so that a home study of Petitioner's home would be conducted.

The DHHR learned that the child had been living with her great-grandparents.[7] The child was permitted to stay with her great-grandparents after they agreed that the mother could not visit without supervision. Further investigation revealed

---

[7] There was evidence that the child visited with her mother, as some of the child's belongings were found in a dumpster after the mother was evicted from her apartment following a police drug raid in December 2018.

that the child had been living with the great-grandparents the entire time she attended elementary school.[8]

The circuit court conducted an adjudicatory hearing in July 2019.[9] Petitioner stipulated that he could have taken additional legal action sooner to seek custody of the child from the mother. He agreed that his failure to do so constituted failure to protect the child and neglect on his part. Petitioner also admitted that he abused drugs when he was younger but stated that he had not abused drugs for many years. Petitioner testified that, "I just feel like I need to move forward and I've grown up and I am ready to provide for my child." The circuit court accepted Petitioner's stipulation and adjudicated him an abusive/neglectful parent. On the record, the circuit court found that Petitioner failed to provide any support to the child until recently, took little action to protect the child from the mother's drug abuse, and that his drug use adversely impacted his ability to parent. Although the circuit court did not make a finding of abandonment, it stated that Petitioner abdicated his role as a parent and that the great-grandparents filled that void. It also noted

---

[8] We do not suggest that the abuse and neglect petition filed against Petitioner lacked the appropriate prerequisites because the child was in the custody of her great-grandparents. This Court has held that a circuit court may adjudicate a non-custodial parent as abusive/neglectful. Syl. Pt. 1, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996).

[9] In a child abuse and neglect civil proceeding, the adjudicatory phase and the dispositional phase serve separate purposes. "The first phase culminates in an adjudication of abuse and/or neglect. [*See* § 49-4-601]. The second phase is a dispositional one, undertaken to achieve the appropriate permanent placement of a child adjudged to be abused and/or neglected. [*See* § 49-4-604]." *In re A.P.-1*, 241 W. Va. 688, 693, 827 S.E.2d 830, 835 (2019).

that there would have to be a showing that it would be in the child's best interest before it would disturb the child's secure placement with great-grandparents, where she was thriving.[10]

In August 2019, Petitioner underwent a psychological evaluation. The evaluator had no concerns about Petitioner's ability to provide adequate parenting for the child. In September 2019, Petitioner began having unsupervised visits with the child for a period of six hours every three weeks.

At a disposition hearing regarding the mother in October 2019, the circuit court terminated her parental rights due to her complete absence from the proceedings. The guardian ad litem submitted a report prior to this hearing stating that remaining with the great-grandparents was in the child's best interest. As the guardian ad litem explained, the child (then age nine),

> is a quiet young person with firm views and significant insight into her difficulties and her mother's challenges. She is deeply attached to [her great-grandparents]. She loves her parents, but has clear and specific views regarding who she can rely on to meet her daily needs and neither parent is considered when she discusses her day to day activities.
> . . . .
> Early on [the child] reported that she lived most with her [great-grandparents], Nanny and PaPaw. She currently reports that she enjoys her school and her activities. She has

---

[10] Petitioner did not appeal the circuit court's October 15, 2019, order adjudicating him an abusive/neglectful parent, and he raises no assignments of error on that issue.

several friends that she has lunch with. She enjoys her dance classes. Her Nanny and Papaw make her feel safe and loved. She enjoys her visits with her Dad and Step-mother. She is worried about her mother. She does not rely on her parents for any aspect of parental care or functioning.

. . . .

[Petitioner] has been significantly absent from his daughter's life since she turned four. . . . [Petitioner's] absence over a significant formative period in his daughter's life has resulted in her attachment and dependence on other people for parenting, emotional, financial and personal support.

Despite this, [Petitioner] has taken reasonable steps since April of 2019 to get to know [the child] better and to begin a building a relationship with [her].

. . .

I am convinced at this time that separation from the [great-grandparents] would be extremely detrimental to [the child's] mental and emotional well being. Remaining with the [great-grandparents] to whom [she] is deeply attached, is in her best interest.

In this report, the guardian ad litem recommended that the circuit court recognize the great-grandparents as the child's psychological parents. She made this motion at the mother's disposition hearing, which Petitioner opposed. Counsel for the DHHR also opposed the motion and took the position that the child should be placed with Petitioner. The DHHR reported that Petitioner was complying with services and the visits with the child were going well.[11] In response to an inquiry from the circuit court as to how the DHHR could show that it would be in the child's best interest to be removed from the great-grandparents home, taken out of the school that she had been in for four years and

---

[11] Petitioner consistently passed drug screens and attended parenting classes.

8

relocated to Florida, where she had never visited, the DHHR's counsel stated that the agency was "just trying to develop the relationship at this point." The circuit court stated it could not comprehend how it could ever be in the child's best interest to be removed from "the only home she's ever known" to be moved to Florida and placed in Petitioner's care. Even with these concerns, the circuit court granted Petitioner's request for a post-adjudicatory improvement period. It instructed Petitioner to reconsider his position of wanting the child to move to Florida with him and stated, "you need to look at her instead of you." The circuit court granted intervenor status to the great-grandparents, but it did not recognize them as the child's psychological parents.

As the case progressed, review hearings were conducted in December 2019 and March 2020. The parties worked together so that Petitioner could visit with the child as the COVID-19 pandemic developed, but visitation became more limited. They began visiting by telephone. As disposition approached, members of the multi-disciplinary team (MDT) met in June 2020. The guardian ad litem states that, with the exception of Petitioner, the MDT agreed to recommend that the circuit court select disposition 5, appointing the great-grandparents as guardians and allowing the child liberal visitation with Petitioner.

But shortly before the disposition hearing, the DHHR reverted to its previous recommendation[12] and submitted a case plan stating "it is the recommendation of the Department that [the child] be reunited with her father." This outcome would require dismissal of the petition and transitioning the child to Petitioner's home as provided in West Virginia Code § 49-4-604(c)(1) (disposition 1). This recommendation was made even though the DHHR never initiated the ICPC process as ordered by the circuit court, and the child had never traveled to Florida to visit Petitioner.

The guardian ad litem submitted a supplemental report recommending the child remain with her great-grandparents under disposition 5. She noted that the DHHR had not provided a rationale for its recommendation that the child be placed with Petitioner. And the guardian ad litem stated that her recommendation for placement with the great-grandparents was based on them being the child's stable caregivers for the last five years. She recommended that the child have ongoing visitation with Petitioner, but stated that the child "does not want to live in Florida. [She] does not want to leave the [great-grandparents]. . . . She does not want to travel for an extended visitation period at this time." The guardian ad litem also reported that the child would consider visiting Petitioner in Florida when she is older.

---

[12] The DHHR filed a case plan in January 2020 recommending that the child be placed with Petitioner.

At the July 23, 2020 disposition hearing, the circuit court questioned Amanda Newman of CPS, who worked on the case for fourteen months, about the basis for the DHHR's decision to recommend disposition 1. She explained that a team of workers with the DHHR reviewed the file and made that decision because Petitioner complied with all the terms and conditions of his improvement period, and under normal circumstances this would call for reunification.[13] Ms. Newman admitted that she was the only member of this team who had met the child. When the circuit court asked Ms. Newman if she believed that it was in the child's best interest to be removed from her great-grandparents home and placed with Petitioner in Florida, she replied, "I don't believe it's in her best interest to be removed." Ms. Newman also stated that the child should continue visitation with Petitioner. She observed those visits and stated that they enjoyed each other's company. Other service providers who supervised visits with Petitioner and the child concurred with this assessment.

Michelle Wetzel, MA, a licensed psychologist, testified that she provided therapy services for the child. She diagnosed the child with an adjustment disorder with anxiety, which is typical for a child who has experienced the losses she had in her life. Ms. Wetzel testified that the child "was very anxious about visiting" Petitioner at first because she did not remember him. But, their visits went well after the initial anxiety subsided.

---

[13] This team included Ms. Newman's direct supervisor, a community service director, an adoption supervisor, and two child welfare consultants.

Ms. Wetzel testified that the child was enjoying her time with Petitioner but did not wish to visit him more often. She stated the child was "very attached" to her great-grandparents and viewed them as parental figures. Ms. Wetzel testified that it is in the child's best interest to remain with them. When asked to describe the bond between the child and Petitioner, Ms. Wetzel stated "I don't believe that there is a bond there. I think that -- I basically think they're getting to know each other. . . . I think things are going well. You know, I think that we just need to continue to work on building that relationship." Ms. Wetzel stated that the child does not want to move to Florida to live with Petitioner but would consider visiting him when she gets older.

The circuit court asked Ms. Wetzel if she agreed with the DHHR's recommendation to remove the child from her great-grandparents home and move her to Florida with Petitioner. She testified that it would not be in the child's best interest to do so. When asked if she believed that move would be "psychologically damaging" to the child, Ms. Wetzel stated "Yes, Your Honor, I do." When the guardian ad litem asked Ms. Wetzel whether anyone with the DHHR consulted with her about its decision to place the child with Petitioner, she said no.

Petitioner testified that he visited the child about twenty-two times since the case began. He believed their visits were going "great," and stated that, "It feels like my family is back together and I feel like I have a loving home and I'm complete. You know, I feel complete. And it feels good." He testified that the child is attached to him when

they are together, and they're "a loving family." Petitioner also stated that he and his wife can provide a home for the child and support her financially. When asked what he would do if the circuit court did not rule in his favor, Petitioner stated "I would never stop fighting for my daughter." Petitioner stated that he filed the petition in family court because he was tired of the mother not letting him see the child.

Petitioner stated that he currently had one video call a week and two phone calls a week with the child because of concerns with COVID-19. He stated that the child enjoyed talking to his son, five-month-old R.C. Petitioner testified that he believed it was in the child's best interest to live with him in Florida. The guardian ad litem asked Petitioner about the therapist's testimony that the child expressed considerable anxiety about going to visit him. He stated that "if that therapist would come to a visit it would be totally different." Petitioner said he suspected that the child said those things because the great-grandmother drove her to the therapist, and the child did not want to disappoint her great-grandmother.

At the conclusion of the disposition hearing, the circuit court stated, "there's no question that this little child has been through a lot in her almost ten years, and she'll be ten in a month. And she's a well[-]rounded very mature little girl in spite of everything that she's been put through by her two parents." It stated that her great-grandparents were her constant support through this time. The circuit court stated that "it is extremely concerning" that Petitioner would discount Ms. Wetzel's opinion and insist that the child

13

be placed with him. It ordered that Petitioner's rights be terminated based on Petitioner's "absence for almost five years and his lack of involvement in this child's life, his lack of support of the child, and lack of nurturing of the child[.]" The circuit court concluded that it would be in the child's best interest to remain in the great-grandparents' custody. It also ordered post-termination visitation based on the recommendations of Ms. Wetzel and the guardian ad litem.

In its September 21, 2020 disposition order, the circuit court stated that the DHHR should have named the great-grandparents as custodians at the time the petition was filed because she lived with them "for the previous four and a half years and . . . they were her primary source of support, emotional care and nurturing." It found that Petitioner "abdicated his responsibility to" the child when he moved to Florida. The circuit court recognized that Petitioner "outwardly appears" to have had "a change of circumstances and came back to step up to the plate." But it found that it was not in the child's best interest to be removed from the home of the great-grandparents. The circuit court stated that it was in the child's best interest to have continued visitation with Petitioner, but that leaving his parental rights intact would lead to an ongoing fight for the child's placement. It stated that, "[f]or this Court to terminate [Petitioner's] custodial rights alone, and to permit him to retain his parental rights, would keep the door open for him to seek to have her moved. That door is now closed. The child is where she has been and where she's going to remain."

14

## II. STANDARD OF REVIEW

In an abuse and neglect case, we give deference to the circuit court's factual findings and conduct an independent review of questions of law:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety."[14]

With this standard in mind, we consider the parties' arguments.

## III.  ANALYSIS

Petitioner challenges the statutory grounds for termination of his parental rights.  He also raises two assignments of error about the manner in which the circuit court conducted the disposition hearing.  As to the latter, Petitioner argues that:  (1) he was denied due process when the circuit court had him appear by video conference due to the COVID-19 pandemic; and (2) the circuit court abused its discretion by "essentially compelling" the

---

[14] Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

witness for the DHHR to testify in a manner that was inconsistent with the agency's recommendation.[15]

We start with the circuit court's findings that the great-grandparents should have been named as the child's custodians, and that it was in the child's best interest to remain in their custody. These pivotal determinations guide our review of the circuit court's disposition order.[16] "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children."[17] This Court has consistently held

---

[15] Petitioner raises two other assignments of error that we readily dispose of as lacking merit. Petitioner contends that the circuit court abused its discretion and committed clear error "by denying" counsel an opportunity to make closing arguments at the conclusion of the disposition hearing. But the record does not support Petitioner's claim. Because no party offered to make closing remarks, the circuit court did not prevent counsel from saying anything; and Petitioner's counsel made no objection. Our general rule is that where objections were not made in the circuit court, and the matter is not jurisdictional in character, the objections will not be considered on appeal. *In re J.S.*, 233 W. Va. 394, 405, 758 S.E.2d 747, 758 (2014).

Petitioner also argues that the circuit court committed error by not properly preserving the record. He refers to a portion of the adjudicatory hearing transcript where the court reporter noted that, "Unknown technical issues occurred." But the court reporter also certified that it was a true and correct transcript of the proceeding. Even if a portion of the adjudicatory hearing was not transcribed due to some technical malfunction, this does not constitute error on the part of the circuit court. There is no indication that the missing portion of this transcript impacts this Court's ability to conduct a full review of Petitioner's appeal of the disposition order.

[16] Petitioner does not challenge these factual findings on appeal.

[17] Syl. Pt. 3, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996).

16

that "[i]n a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided."[18]

### A. *Best Interest of Child to Remain with her Custodians, the Great-Grandparents*

The circuit court found that it was in the child's best interest to remain in the custody of her great-grandparents, considering that parental relationship, the child's bond with them, and her preference to remain in their home. The child's therapist, Ms. Wetzel, testified unequivocally that the child should remain in their home. As she explained, the child "is stable there. She does very well in school. She loves her school. She is active with friends. And she really looks at them as her parents." Ms. Wetzel went on to explain that it is obvious the child was very attached to her great-grandparents and this has not been a temporary relationship. The CPS worker and the guardian ad litem also concluded that it was in the child's best interest to remain with her great-grandparents.[19]

We recognize the strides Petitioner has made in realizing that it is important that he and his child have a relationship. After being largely absent from her life, Petitioner has made significant efforts to achieve that relationship. At the beginning of these

---

[18] Syl. Pt. 4, *In re J.S.*, 233 W. Va. 394, 758 S.E.2d 747 (2014) (quoting Syl. Pt. 1, *State ex rel. Cash v. Lively*, 155 W. Va. 801, 187 S.E.2d 601 (1972)).

[19] In her Child Status Update to this Court, the guardian ad litem reported that the child continues to thrive with her great-grandparents. She is in the 6th grade where she excels academically and socially.

proceedings, the child was very anxious about visiting with Petitioner because she did not remember him. But their relationship has progressed exceptionally well, and the child enjoys visiting with Petitioner.

But Petitioner's desire to raise his daughter must be tempered by the reality that the child needs the continued stability her great-grandparents provide. She has been in this stable family unit for years. Ms. Wetzel testified that it would be detrimental to the child's welfare to now move to Florida to live with Petitioner. One might sympathize with Petitioner's plight, but that plight was of his own creation. Unfortunately for him, his lengthy failure to act as a parent to the child came during a critical portion of her life.

We disagree with Petitioner's claim that the circuit court erred by failing to consider him as a viable placement for the child. The circuit court's reluctance, throughout the proceedings, to disturb the child's stable family unit with the great-grandparents was grounded in sound principles of law. "The question at the dispositional phase of a child abuse and neglect proceeding is not simply whether the parent has successfully completed his or her assigned tasks during the improvement period. Rather, the pivotal question is what disposition is consistent with the best interests of the child."[20] Petitioner put forth no evidence to demonstrate that it was in the child's best interest to move to Florida and live

---

[20] *In re Frances J.A.S.*, 213 W. Va. 636, 646, 584 S.E.2d 492, 502 (2003).

with him.[21]  But, he did demonstrate that it is in the child's best interest to continue visits with him.

The circuit court also found that the great-grandparents should have been named the child's custodians.  To qualify as a custodian, a person must have held custodial rights to the child prior to the initiation of the abuse and neglect petition.[22]  This designation would have triggered a host of procedural due process protections for the great-grandparents including right to notice,[23] counsel,[24] and "a meaningful opportunity to be

---

[21] In a similar context, when a family court or circuit court appoints a guardian for a minor under West Virginia Code § 44-10-3 (2013), a parent who later files a petition to revoke or terminate that guardianship must "show by a preponderance of the evidence that there has been a material change of circumstances and that a revocation or termination is in the child's best interest."  *Id*. at § 44-10-3(j).  This Court has held that, "[t]o justify a change of child custody, in addition to a change in circumstances of the parties, it must be shown that such change would materially promote the welfare of the child."  Syl. Pt. 2, *Cloud v. Cloud*, 161 W. Va. 45, 239 S.E.2d 669 (1977).  But in this case, the great-grandparents had never sought legal guardianship of the child.

[22] *State ex rel. H.S. v. Beane*, 240 W. Va. 643, 647-48, 814 S.E.2d 660, 664-65 (2018).  "A person who obtains physical custody *after* the initiation of abuse and neglect proceedings—such as a foster parent—does not enjoy the same statutory right of participation as is extended to parents and pre-petition custodians."  *Id*. (Citation omitted).

[23] *See* W. Va. Code § 49-4-601(e) (2019) ("Notice of hearing.  (1) The petition and notice of the hearing shall be served upon both parents and any other guardian, *custodian*, or person standing in loco parentis, giving to those persons at least five days' actual notice of a preliminary hearing and at least 10 days' notice of any other hearing.  (2) Notice shall be given to the department, any foster or pre-adoptive parent, and any relative providing care for the child.")  (emphasis added).

[24] *See* W. Va. Code § 49-4-601(f) ("Right to counsel. . . .  (2) The court's initial order shall appoint counsel for the child and for any parent, guardian, *custodian*, or other person standing in loco parentis with the child if such person is without retained counsel.")  (continued . . .)

heard, including the opportunity to testify and to present and cross-examine witnesses."[25]
More to the point, the DHHR should have provided social services to support and maintain
the child's stable family unit, in addition to assisting Petitioner with his improvement
period goals. These initiatives were not mutually exclusive.

The State has a strong interest in preserving and promoting the welfare of
children.[26] Our Legislature has recognized the importance of strengthening and preserving
family relationships when possible. West Virginia Code § 49-1-201 (2018) defines "[c]hild
abuse and neglect services" as "social services which are directed toward: . . . (C)
Preventing the unnecessary removal of children from their families by identifying family
problems and assisting families in resolving problems which could lead to a removal of
children and a breakup of the family[.]" And this Court has held that, "[i]n formulating the
improvement period and family case plans, courts and social service workers should

(emphasis added); *see also In the matter of Lindsey C.*, 196 W. Va. 395, 473 S.E.2d 110
(1995) ("Circuit courts should appoint counsel for parents and custodians required to be
named as respondents in abuse and neglect proceedings incident to the filing of each abuse
and neglect petition.").

[25] *See* W. Va. Code § 49-4-601(h) ("Right to be heard. In any proceeding pursuant
to this article or *parties having custodial or other parental rights or responsibilities to the
child* shall be afforded a meaningful opportunity to be heard, including the opportunity to
testify and to present and cross-examine witnesses. Foster parents, pre-adoptive parents,
and relative caregivers shall also have a meaningful opportunity to be heard.") (emphasis
added).

[26] *Santosky v. Kramer*, 455 U.S. 745, 765 (1982).

cooperate to provide a workable approach for the resolution of family problems which have prevented the child or children from receiving appropriate care from their parents."[27]

Because the DHHR never appeared to grasp the significance of identifying the great-grandparents as the child's custodians during the proceedings below, it did not advocate for preserving her family unit with them while assisting Petitioner with his improvement period. The great-grandparents, blood relatives to the child, had assumed all parental responsibilities for the child years before this petition was filed. And they make a compelling argument that this case should never have been about "reunification" efforts to place the child with Petitioner because she was not removed from her family. Rather, Petitioner left her years ago, and she was being raised by her family. When addressing reunification efforts, West Virginia Code § 49-1-201 provides that "[c]hild abuse and neglect services" include "time-limited reunification services" . . . "[i]n cases where children have been removed from their families[.]"[28] This was not the usual case where a child was removed from her home and placed with foster parents.

As this case progressed, social services succeeded in resolving some of the family problems preventing the child from receiving appropriate care from Petitioner. The child and Petitioner began to develop a relationship and he began supporting her

_____

[27] Syl. Pt. 4, in part, *In re Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

[28] *Id*. at (D).

21

financially. But these accomplishments do not necessarily trigger a removal of the child from her stable family unit; in this case, that result would be antithetical to the child's best interest and the State's strong interest in preserving and promoting her welfare.[29]

After the circuit court found it would be contrary to the child's best interest to remove her from the home of her great-grandparents because it would break up the stable family environment she has enjoyed for years, only two dispositional alternatives remained—disposition 5 or disposition 6. The other dispositional alternatives (one through four) [30] were no longer applicable because those dispositions would entail a change of custody to Petitioner's home, contrary to the welfare of the child. We next address whether the circuit court erred in selecting the most drastic dispositional alternative, disposition 6, when it terminated the parental right of Petitioner.

### B. Insufficient Evidence to Support Termination of Parental Rights

The disposition phase of child abuse and neglect proceedings is governed by West Virginia Code § 49-4-604(c), which provides several alternatives the court may consider, with precedence given to the least restrictive alternative appropriate to the

---

[29] To the extent that Petitioner questions why the circuit court would grant his request for an improvement period if it never considered him a viable permanent placement, we remind him of the tremendous progress that was made during these proceedings. It was through this process that Petitioner was deemed suitable for continued visitation with the child.

[30] *See* note 31, *infra*.

circumstances of a case.[31] This Court has held that the best interest of the child is the determinative factor at disposition:

> In making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered. The controlling standard that governs any dispositional decision remains the best interests of the child.[32]

---

[31] West Virginia Code § 49-4-604(c) provides that the circuit court "shall give precedence to dispositions in the following sequence:"

(1) Dismiss the petition;
(2) Refer the child, the abusing parent, the battered parent or other family members to a community agency for needed assistance and dismiss the petition;
(3) Return the child to his or her own home under supervision of the department;
(4) Order terms of supervision calculated to assist the child and any abusing parent or battered parent or parents or custodian which prescribe the manner of supervision and care of the child and which are within the ability of any parent or parents or custodian to perform;
(5) Upon a finding that the abusing parent or battered parent or parents are presently unwilling or unable to provide adequately for the child's needs, commit the child temporarily to the care, custody, and control of the department, a licensed private child welfare agency, or a suitable person who may be appointed guardian by the court. . . .
(6) Upon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future and, when necessary for the welfare of the child, terminate the parental, custodial and guardianship rights and responsibilities of the abusing parent[.]

[32] *In re B.H.*, 233 W. Va. 57, 754 S.E.2d 743 (2014).

In this case, the circuit court ordered termination of Petitioner's parental rights under disposition 6. This disposition allows for termination of parental, custodial and guardianship rights where there is "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and "when necessary for the welfare of the child[.]"[33] Petitioner maintains that the circuit court erred in finding that termination of his parental rights was in the child's best interest when the evidence demonstrated that he successfully completed his improvement period. Petitioner notes that at the disposition hearing, the guardian ad litem recommended disposition 5, and the DHHR recommended complete dismissal of the petition under disposition 1.

The DHHR, guardian ad litem, and great-grandparents respond collectively that the circuit court did not err in terminating Petitioner's parental rights when he rejected a proposed disposition 5, demonstrating a lack of insight into his daughter's needs. West Virginia Code § 49-4-604(d)(3) provides that a circuit court may find that there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected when the abusing parent has "not responded to or followed through with a reasonable family case plan . . . designed to reduce or prevent the abuse or neglect of the child[.]" The DHHR argues the evidence supports this finding when we consider that Petitioner refused to cooperate with the family case plan—generally agreed to at the last

---

[33] *Id.* at § 49-4-604(c)(6); *see also In re A. P.*, 245 W. Va. 248, 858 S.E.2d 873, 880 (2021) (stating disposition 6 "very specifically directs the court to consider the individual needs of the child who is the subject of the petition.").

MDT meeting held before disposition—that the less-restrictive, alternative disposition 5 was appropriate, along with him having visitation. The guardian ad litem and the great-grandparents state that the circuit court was focused on the child's best interest and its belief that she needed permanency and stability. They argue that Petitioner's testimony shows that he is unable to put the child's emotional well-being above his own desires when he insisted the child be removed from the great-grandparents' custody, even after her therapist testified it could cause lasting emotional damage.

As discussed above, disposition 6 must be anchored by a finding that there is "[n]o reasonable likelihood that conditions of neglect or abuse can be substantially corrected" as well as a finding that termination is "necessary for the welfare of the child."[34] In its disposition order, the circuit court did not make a finding on the first prong of the statute. And considering Petitioner's current ability to care for the child and conduct throughout these proceedings, we find that the evidence does not support this finding. Petitioner remedied the conditions that led to his adjudication, and the psychologist who evaluated him had no concerns regarding his ability to provide adequate parenting for the child. By all accounts, his visitation with the child continues to be positive and their relationship is growing.

---

[34] W. Va. Code § 49-4-604(c)(6).

The circuit court also did not make a finding on the second prong of disposition 6 in its order, that termination of Petitioner's parental rights was "necessary for the welfare of the child."[35]  Simply because the record is clear that the child should remain with her great-grandparents, we should not presume the presence of this second factor.  The less-restrictive disposition 5 would also permit the child to maintain her custodial placement with the great-grandparents while keeping Petitioner's parental rights intact.  For these reasons, we find that the circuit court erred in terminating Petitioner's parental rights.

A guardianship under disposition 5 is the only dispositional alternative that lends itself to leaving Petitioner's parental rights intact while recognizing the paramount best interest of the child.  Under the unusual facts presented, disposition 5 will not interfere with the permanency plan for the child.  There is no question that she is in a stable family environment with her great-grandparents.  So, their appointment as the child's guardians under disposition 5 maintains the status quo of her family unit.

On remand, the circuit court must "determine under what circumstances the child's commitment to the department [is] to continue.  Considerations pertinent to the determination include whether the child should: (i) Be considered for legal guardianship;

---

[35] *Id.*

[or] (ii) Be considered for permanent placement with a fit and willing relative[.]"[36] The circuit court must also hold proceedings to address continued visitation with Petitioner. We urge the parties to work together to develop a visitation schedule that will accommodate the child's best interest. "The need for a timely determination of a child's status vis-à-vis a parent is to keep children from living in limbo with no stability for what, in child time, is a long time. This is to protect the interests of the child."[37]

We now turn to Petitioner's assignments of error regarding how the circuit court conducted the disposition hearing.

### C. *Petitioner Was Afforded Due Process*

Petitioner challenges the circuit court's disposition hearing on due process grounds. In a child abuse and neglect civil proceeding, statutory due process protections entitle the child's parent to have notice of hearing,[38] right to counsel,[39] and "a meaningful opportunity to be heard, including the opportunity to testify and to present and cross-

---

[36] W. Va. Code § 49-4-604(b)(5)(E). The third option under this statute is not applicable here.

[37] *Int. of T.H.*, No. 123,504, 2021 WL 3700413, at *15 (Kan. Ct. App. Aug. 20, 2021).

[38] W. Va. Code § 49-4-601(e).

[39] *Id*. at § 49-4-601(f).

examine witnesses."[40]  This Court has held that a parent enjoys constitutional due process

protections in these proceedings:

> West Virginia Code, Chapter 49, Article [4], Section [601 (2015)], as amended, and the Due Process Clauses of the West Virginia and United States Constitutions prohibit a court or other arm of the State from terminating the parental rights of a natural parent having legal custody of his child, without notice and the opportunity for a meaningful hearing.[41]

Petitioner argues that the circuit court abused its discretion and committed

clear error by denying him the opportunity to be physically present at the disposition

hearing.  This hearing was held on July 23, 2020, well into the COVID-19 pandemic.

Because Petitioner resides in Gainesville, Florida, which the circuit court found to be a

COVID-19 "hot spot,"[42] Petitioner was given the option of either appearing in person if he

quarantined for fourteen days after arriving in West Virginia, or participating by video

conference.  Petitioner objected and requested a continuance, stating that he could not

quarantine due to work obligations and wanted to appear in person.  But the circuit court

---

[40] *Id.* at § 49-4-601(h).

[41] Syl. Pt. 3, *In re T.S.*, 241 W. Va. 599, 827 S.E.2d 29 (2019) (quoting Syl. Pt. 2, *In re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973)).

[42] The circuit court relied on data available from the Harvard Global Health Institute's website to make this determination.

denied the motion.[43]  Arrangements were made for him to appear by video conference, with his counsel present in person.  Petitioner contends that this arrangement did not afford him a meaningful opportunity to be heard.  The DHHR, guardian ad litem, and great-grandparents respond that that the circuit court was following this Court's guidance regarding the COVID-19 pandemic, and that Petitioner was fully able to participate at the disposition hearing.  We agree.

First, the circuit court did not deny Petitioner the opportunity to appear in person.  Rather, because Petitioner rejected the opportunity to quarantine after arriving in West Virginia and then attend in person, he appeared by video conference.  Petitioner made the decision that was more convenient for him.  And second, even had the circuit court denied Petitioner the opportunity to appear in person because of concerns with the COVID-19 pandemic, this alternative method provided him the opportunity to testify and hear the evidence presented by the other parties; his counsel was physically present and able to present and cross-examine witnesses.  Because Petitioner was given a full, fair, and meaningful hearing, he has not shown a due process violation.

Faced with the challenges of the COVID-19 pandemic, trial courts in this State and others throughout the country held hearings in matters dealing with parental

---

[43] In its order denying Petitioner's motion, the circuit court stated that it was complying with the terms of a July 8, 2020 memorandum from the Administrative Director of this Court regarding the quarantine/testing policy for employees who return from out-of-state travel.

rights with the parties appearing remotely. The Supreme Court of Wyoming considered a mother's due process challenge to this procedure in *In re T.J.H.*.[44] It held that the mother's due process rights were not violated when the lower court held an evidentiary hearing on her motion to set aside a default judgment in a parental termination proceeding by video conference rather than in person. In *T.J.H.*, COVID-19 pandemic precautions resulted in all hearing participants, including the mother's counsel, appearing separately by video conference.[45] The court recognized that although the mother's interest in associating with her child was strong, "there was no greater risk her interest would be erroneously deprived through a video hearing than an in-person hearing."[46] The court also considered the State's "weighty interest in an accurate, just and timely decision." [47] And balancing those factors, it upheld the lower court's use of video conferencing.[48] We find this reasoning persuasive.

Having found that the circuit court afforded Petitioner adequate due process protections, we proceed to the remaining assignment of error.

---

[44] 485 P.3d 408 (Wyo. 2021).

[45] *Id*. at 413.

[46] *Id*. at 416.

[47] *Id*.

[48] *See also Interest of A.H.*, 950 N.W.2d 27 (Ct. App. Iowa 2020) (rejecting parents' due process challenge to court holding parental rights termination hearing by telephone due to the COVID-19 pandemic).

### D. Circuit Court had the Authority to Question the Child's CPS Worker

Petitioner's final argument is that the circuit court abused its discretion and committed clear error by "essentially compelling" the witness for the DHHR, CPS worker Ms. Newman, to testify in a manner that was inconsistent with the position of the agency. Prior to the disposition hearing, the DHHR filed a case plan and recommended disposition 1. At the hearing, the circuit court asked Ms. Newman if she believed that it was in the child's best interest to move to Florida with Petitioner. She responded that it would be in the child's best interest to remain in the home of her great-grandparents. Petitioner notes that the circuit court questioned Ms. Newman before any counsel had the opportunity to do so.[49] The great-grandparents respond that the circuit court had the discretion to question Ms. Newman about her opinion, especially when the DHHR's decision to recommend disposition 1 came as a surprise to them; the permanency plan under discussion at the MDT meeting before the disposition hearing was disposition 5. The DHHR responds that the circuit court did not err because it was charged with weighing the credibility of witnesses and rendering findings of fact.

---

[49] Petitioner did not raise an objection below, so the matter was not preserved for appeal. But we find that the issue warrants brief discussion and the parties fully briefed it. This Court may address unpreserved alleged error. *In re J.S.*, 233 W. Va. at 405, 758 S.E.2d at 758.

The guardian ad litem responds that the circuit court has the authority and obligation to conduct its own inquiry into the facts regarding the child's best interest and placement and the basis for the DHHR's placement recommendations. Although Petitioner challenges the circuit court's discretion in the manner in which it questioned Ms. Newman, this inquiry was "the heart of the court's task at disposition[.]" The guardian ad litem states that the circuit court has the authority to modify the child's case plan based on the facts of the case. Rule 35(b)(1) of the West Virginia Rules of Procedure in Abuse and Neglect Proceedings provides, in relevant part, that "the court shall then determine if the case plan or plans before the court require amendment by reason of the findings of the court and require such modification of the plan or plans as may be appropriate."

When conducting a disposition hearing, the circuit court acts in two distinct capacities: first, as a gate keeper, ruling on the admissibility of evidence; and second, as the fact-finder, gathering information and affording weight to that evidence. At the conclusion of this hearing, the circuit court must determine "the appropriate permanent placement of a child adjudged to be abused and/or neglected."[50] And circuit courts have broad authority to control the order and presentation of evidence in matters that come before them. West Virginia Rule of Evidence Rule 611 provides that "[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence" for three purposes: "(1) make those procedures effective for determining the

---

[50] *In re A.P.-1*, 241 W. Va. at 693, 827 S.E.2d at 835.

32

truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." A circuit court "may call a witness on its own" and "examine a witness regardless of who calls the witness."[51] It may also appoint an expert witness and call that witness to testify.[52]

In this case, the circuit court's questioning of Ms. Newman was proper under our rules and consistent with its role as fact-finder. So, we find no abuse of discretion or reversible error.

## IV. CONCLUSION

For the reasons set out above, we reverse the September 21, 2020 disposition order of the Circuit Court of Taylor County and remand with directions to enter disposition under West Virginia Code § 49-4-604(c)(5) and to appoint the great-grandparents as the

---

[51] Rule 614 of the West Virginia Rules of Evidence provides:

> (a) Calling. — The court may call a witness on its own or at a party's request. Each party is entitled to cross-examine the witness.
> (b) Examining. — The court may examine a witness regardless of who calls the witness. In jury trials the court's examination shall be impartial so as not to prejudice the parties.
> (c) Objections. — A party may object outside the presence of the jury to the court's calling or examining a witness.

[52] W. Va. R. Evid. 706.

child's guardians.  It should also set the matter for further proceedings to address continued visitation between Petitioner and the child.

Reversed and remanded with directions.